May it please the court. Joseph Clappage for Appellant Gary Klein. This is an appeal from summary judgment in a section 1983 judicial deception case and I want to start by discussing the standard of review because frankly this case turns entirely on the standard of review. This case was decided on summary judgment as this court held in the Bravo and Hervey cases and the Third Circuit held in the Reedy case. At the summary judgment stage where there are two reasonable explanations for a plaintiff's conduct, a court must adopt the interpretation that favors the plaintiff and all reasonable inferences therefrom. And this means that if a fact could be construed in either an innocent manner or a guilty manner, the court for purposes of summary judgment has to construe that fact in an innocent manner. That's the standard for summary judgment. And this is really the fundamental problem with the district court's decision in this case. Throughout its decision, the district court construes the evidence in the light that's least favorable to my client. And by doing so, it makes exactly the same error that the courts made, the district courts made in Bravo, Hervey, and Reedy. In each of those cases, the appellate court, including this court and the Third Circuit, reversed a district court that interpreted the evidence in the wrong light and gave the plaintiff the benefit of the doubt. Give me, say, a material example where Judge Walter did this, in this case, in his order. Where the evidence was not interpreted in the light most favorable to my client? I can do that in two fashions. I can do that in connection with Just point to me one passage in Judge Walter's order where he did that. Can you do that? Sure. Sure. Give me a page in line reference. So for example, the affidavit states that Gary, who is not a doctor, insisted that Rina be put on dialysis. And this was a red flag because individuals don't normally insist that people get put on dialysis, right? This wasn't true. The record shows that Rina's doctor, Dr. Okuha, not Gary, directed that Rina receive renal replacement therapy, not because Rina was suffering from renal failure. Well, it could have been both. I'm sorry? It could have been both of them. I'm sorry. It could have been both of them. It could have been both of the doctor and the plaintiff who said she should be put on dialysis. It doesn't have to be one or the other, does it? I see what you're saying. Well, at the summary judgment stage, our contention is that this is not true, right? But that, even if you take what you say is true, that he viewed it in the light most favorable to the movant as opposed to your non-movant client, that fact alone wasn't dispositive to Judge Walter's disposition of the case, was it? That's true. And so let me take a step back and just dive right into these allegations. You know, I asked you, give me one material example where Judge Walter did what you said he shouldn't have done, which is, you know, construe the facts and make inferences unfavorable to the plaintiff. Well, there are... And you haven't pointed out such an example to me yet. There are... You know, I said, give me the page in line and in order, and you haven't done that, have you? Well, the, I mean, I believe that what the court, the court construed the record, looking at it and saying, well, I think Gary is, it's evidence of Gary's guilt that he... Give me a page in line. Where are you, what are you reading from? I'm looking at the, the affidavit states that is a red flag... Right? Now show me where you did that. Isn't that how you started out? Okay. So in, if you look at page seven of the judge's order... Page seven. Which is page nine in the, in the first volume of the excerpts of record, right? It lists a series of ten... Which paragraph? The first or second paragraph? The second paragraph. All right. Right? It then lists a series of ten facts that it states are, help establish probable cause in this case. Yes. All of which are being construed in the light least favorable to my client. For example, let me, let me take here the number nine. Dr. Philbin stated that when Gary Klein was at the hospital and Reno was being treated, he displayed behavior that was over the top, that Gary was out there and unrealistic and he delivered a eulogy in a dramatic way. Right? There's an innocent explanation for his over the top behavior. Genuine grief. He was genuinely feeling powerful grief. And what the trial judge did here is exactly the same thing the trial judge did, the district court did in Reedy, which was imposed a value judgment on how a person should react to a traumatic situation with a, with a loved one dying. Let's move on to the next portion of the district court's analysis, because since you're pointing us to those pages, analyzing the purported omissions or false statements, the district court did ultimately say that even if you had made the showing, the court concludes, and I'm looking at page eight, ER 10, that the June 2011 affidavit, once corrected and the June 2011 warrant, or do you want to talk about the August 2009 warrant? Let's talk about August 2009. The entire theory behind this crime, right, is that Gary allegedly conspired with Dr. Metzger to obtain Percodin. He then administered a Percodin overdose to his wife. He then covered up this crime by putting Rena on dialysis and preventing an autopsy. And then he profited from the crime by forging a codicil to the will. That's the entire theory of the affidavit. Every single one of those facts is false and proven false in the record. First, especially in the record viewed in the light most favorable to my client. First, let's talk about the murder weapon, right? The affidavit states that Dr. Feldman saw Percodin at the hospital amongst Rena's belongings. He was deeply troubled by this because it was inconsistent with the medications that Rena was taking. This bottle of Percodin is the murder weapon, right? It's the very Percodin that Gary is supposed to have used to administer the overdose to his wife. And it didn't happen. Dr. Feldman told Chilson in an interview a few days before that he didn't see any bottle of Percodin at the hospital in Rena's belongings. That's at volume two of the excerpt from the record at page 123. So the appellees knew that there was no murder weapon and they deliberately misled the magistrate about that. And I would ask you, as your honors are reviewing this, put yourself in the position of the magistrate and ask, would I want to know this fact? Let's talk about the second fact, right? The entire theory of the affidavit, the August 2009 affidavit, is that Rena died from a Percodin overdose. But the affidavit conceals and obscures the highly material fact that there was no Percodin in Rena's body. Rena was tested three times for illicit drugs. All three tests came back negative for Percodin, for illicit drugs like Percodin. The hospital tested Rena's blood for Percodin when she was admitted. That's at volume two, page 105. The hospital tested Rena's urine for Percodin during her treatment, volume two, page 109. And Rena's bile was tested for Percodin as part of the June 2009 Class D autopsy, page 105 to 106. All of those tests came back negative. And Dr. Ribe, who did the 2009 autopsy, he testified that Rena's blood at the postmortem stage is irrelevant because of the length of the hospitalization that she had. The blood postmortem really isn't going to matter. The bile is where it's at because the bile retains the drugs for much longer period of time. And he said basically that the bile is more accurate. The bile test came back negative. So the bottom line is that they knew conclusively from these three separate negative tests there was no Percodin in her body. And so if you're the magistrate signing off on this search warrant, don't you want to know that this theory of a Percodin overdose is directly contrary to the medical evidence? We have tests that show no- All right. Now, the law in this kind of case, as I understand it, is that assuming you're right, which are false. Correct. And then you ask yourself, well, is what's left in the affidavit sufficient to show probable cause, right? Exactly. And the answer to that question is- Is clearly no. And let me do that. I'll do that very analysis for you right now. There's seven things, seven major things that are false in the August 2009 affidavit. The first is the presence of the bottle of Percodin. The second is that there's no Percodin in her body. Well, I- The third- To follow up on Judge Tashima's point, you focus on what's left to determine whether- I agree. So what I'm trying to describe to you is what we're taking out, right? The third point- Why don't you tell us what's left? Because that's- I'll focus on what's left. What's left after you take out the forged cortisol, the- No, you don't have to go through that. Just tell us what's left. Okay. What's left is six things. One, Dr. Metzger's presence at the hospital, right? His presence at the hospital and his history of prescription irregularities is irrelevant. Because one, there's no evidence Rena died from a drug overdose. Two, there's no evidence that Dr. Metzger wrote prescriptions for and this goes to the reading point that I made earlier about you have to view the evidence in the most favorable light to the plaintiff. There's an innocent explanation for him being there. He's a doctor for Gary. He knows the family. He stopped by to share his condolences. All right. Let me- Let me see if I can short circuit this because you've only got under four minutes left. I know. As I see it, what's left is that there was an indication of a threat. He said that if she never saw the kids again, three weeks before her death, Rena told Julie that Gary had told her if he wanted to get rid of Rena, he could do it. No one would know how she died. There was indications from other- the Feldmans that he was controlling and always put her down. They had a bad marriage. She was seeking a divorce from Gary. She was afraid and had actually told people she was afraid that Gary knew. He was very angry when her medications got removed from his home after her death. Dr. Metzger, who's known to be a very loose prescription writer with a patient who died of an overdose, came to the hospital the night she died. Julie and Anita said Gary insisted Rena be treated with dialysis. Less than 24 hours after she died, Gary called her probate attorney to ask about the finances, and the counsel to Rena's will seemed forged. Anita, Julie, and Dr. Feldman said Gary didn't want an autopsy. Is there anything among the list of things I've listed that should also have been out? I think that there are some things on that list that should be out about the autopsy and the forged codicil, and I think there's another major point, which is the motive to lie. The affidavit relies almost entirely on the statements of Rena's mother, Julie, and her sister, Anita. But if you were a magistrate trying to decide whether to issue the search warrant, I think you would want to know that Dr. Feldman told them that Julie and Anita had a vendetta against Gary, they had a strong motive to lie, and they were trying to get Gary convicted. Did the magistrate judge have all of this before him, what you were just saying there about this alleged vendetta? No, that was one of the omitted facts, that it was not disclosed. But the point is that given the list of things that Judge Winn just ticked off, many of them considered separately would have been sufficient to warrant the issuance of a search warrant, wouldn't it? But I disagree, because I think you have to again construe these facts in the light most favorable to the plaintiff, which means is there an explanation for this? When those facts are presented to the magistrate judge, does the magistrate judge have to view them in the light most favorable to the target of the warrant? No, but in this context where we're talking about, and again, this is exactly what happened in Reedy and in Hervey, right? When the court does the analysis, and this is why I started with there were chemical drums on the property, and the court said all of these things have innocent explanations, and we have to take the innocent explanation for purposes of this. Here's the point. The items that were just delineated by Judge Winn sort of constitute the corrected affidavit. And the point is, didn't those items provide a substantial basis for a reasonable magistrate to find probable cause? And my answer to that question is an emphatic no, because there's innocent explanations for every single one of those things, and there's really material points. I mean, the people who are providing you this information want to see Gary go to jail so they can take custody of his children. I thought your point, though, was that the district judge viewed the evidence in the light most favorable to the movement. But we're looking at an affidavit that has now been corrected, and even viewed in the light most favorable to Mr. Klein, still some of these items will be sufficient, particularly when taken together, to constitute probable cause. Well, I mean, we laid out in our brief in great detail how each of these items and how there's really nothing left once you take out the main theory here. And that's what we're saying. I think to some extent you're not focusing on what I think my colleagues and I are on the same page in terms of focusing on. Let's give you all that. Let's throw out, for the sake of argument, all of the things that you claim should have been omitted. What's left are a certain set of facts, and if we look at those facts and they still provide a substantial basis for probable cause so that the warrants would have been issued anyway, then you should lose, correct? That's the correct framework that we're looking at? If the Court believes that, then that's true. What I'm saying is, I think if you look at each of these facts, each of these, I got nine from the second warrant and six from the first, each of these facts construed in the light most favorable to my client is not evidence to support probable cause. We'll throw it all out. We'll only look at what's left. I agree. That's what I'm saying. Let's look at what's left and there's nothing to do. Right. Now you're over your time, so I want to make sure that you have a chance to at Good morning, Your Honors. May it please the Court. Lois Bobak for appellees. I think that it's important to point out, at least from my perspective, that the standard of review that Mr. Klein is advocating in this case is a departure from established Ninth Circuit rule. The standard in a typical judicial deception case is usually stated by the Court as a two-part test, but in practice, it's really a three-part test. And the first part of the test is whether there was false information included in the affidavit or exculpatory evidence omitted from the affidavit. That's a question of fact. And in construing the evidence, the Court has the admissible evidence that was presented in opposition to the motion for summary judgment, not conjecture and speculation in later appeal briefs. The Court has to construe the admissible evidence in the light most favorable to the non-moving party. The Liston case is a good example of that, where there was a dispute about whether or not there was a for sale sign out in front of a property where an officer was getting a warrant to search that property. The officer admitted that he drove by the property a few days before he wrote the application for the warrant, and he saw the for sale sign but didn't put that in the warrant application. The homeowners submitted admissible evidence in opposition to the motion for summary judgment that said there was a sold sign on that sign. So because there was a dispute in the evidence as to whether or not there was a sold sign, the Court accepted the plaintiff's evidence as true, and for purposes of then the materiality analysis, assumed that there was a sold sign. Then you get to the materiality test, which is the second step. Assuming that the plaintiff met his initial burden of showing through substantial evidence that there was a false statement in the affidavit or that there was exculpatory evidence omitted, the Court then, as a matter of law, construes what's left. You excise the false material. You write in the exculpatory material, and you construe what's left using the same standard that judges and magistrates all over the country use to determine, except perhaps in the Third Circuit, use to determine whether there's probable cause. You look at all of the circumstances identified in the warrant application, and you determine whether there's a fair probability that evidence of a crime might be found at the location that's going to be searched. That's an objective standard. You do not assume— No, but you see, you're not really—I'm not arguing with you, but I don't think that really lays out the standard correctly, because on that kind of case, when you're looking at those so-called facts, I think—now, you see, your opponent argued that, well, you have to construe all the inferences in favor of the plaintiff because the city was a moving party in that case, but when you construe a search warrant affidavit, I think you read the affidavit to see whether reasonable inferences that could be drawn from the facts give rise to probable cause. You don't—I don't think when a magistrate looks at a search warrant affidavit, the That's exactly my point. I agree with you 100 percent. Mr. Klein is advocating that in that analysis, the magistrate has to construe all of the facts in favor of the party against whom the warrant is going to be issued. And I think that's a wrong analysis. In other words, I think your statement captures it. We have to construe the remaining facts in the same manner that search warrants are usually reviewed. That's absolutely correct, Your Honor. Because that's a question of law. That's the point where Mr. Klein wants the Court to look at what's left in the affidavit and say, well, was there an innocent explanation for that? For example, his behavior at the hospital and his behavior at the funeral. He didn't present any evidence in opposition to the motion for summary judgment that he didn't, in fact, engage in the behavior that was reported to Detective Chilson and reflected in the affidavit. So there's no dispute as to whether or not that behavior occurred. What he wants the Court to do is then say, when the Court is addressing the materiality standard, to assume that perhaps there's an innocent explanation for that. And I would submit that if that's the standard, then very few warrants are going to be issued. Just hypothetically, you have a robbery at a convenience store and you have a witness who places a suspect at the convenience store within minutes of the robbery. If the magistrate, considering whether or not to issue that warrant, has to assume that there's an innocent explanation for the suspect being there and then write out of the warrant application anything that has an innocent explanation, that eyewitness account or that eyewitness testimony of the subject being at the convenience store minutes before the probable cause analysis. And that's just not what the Ninth Circuit case law holds. Assuming that the Court, in reviewing the materiality, then determines that the rewritten affidavit does not support probable cause, then the conclusion is that, well, the material that was taken out or that was improperly omitted was material. Then you get to what is, in essence, the third step of the judicial deception analysis, and that is, did the plaintiff submit substantial evidence of intentional misrepresentation or deliberate disregard to the truth? And I think that the district court correctly found in this case that Mr. Klein failed at all three of those levels. He, for the most part, did not present any competent evidence that called into question the truth of any of the statements in the allegation, the one notable exception being Dr. Feldman's statement to a prior detective involved in the case that he saw a bottle of Percodan. Detective Chilson noted in the affidavit that the toxicology report on the bio showed no drugs, so that was an accurate representation of the fact that, in fact, Percodan wasn't found, and he also included a list of the prescriptions that were taken from the Klein home by Rena Klein's mother, and Percodan was not among the list. So there was information before the magistrate that no Percodan was found and that there wasn't a prescription for Percodan. And then Detective Klein removed that from subsequent affidavits. But with that exception, none of the other information in the affidavit, in any of the affidavits, is demonstrably false. What Mr. Klein wants the court to do is just to assume that there might be an innocent explanation in the materiality analysis, and that can't be done. With regard to the evidence of whether or not there was intentional misrepresentation or conscious disregard for the truth, with regard to the testing, for example, my colleague indicated that the affidavit materially misrepresented that there was, in fact, no Percodan found. I don't think that's the case. The affidavit actually said testing on bio was negative. But in any event, the only record that the evidence establishes that Detective Chilson had at the time was the investigative report from the coroner's office. There is absolutely no evidence that he had the medical reports when he wrote the August 2009 affidavit. He can't intentionally misrepresent something that he doesn't have. If he doesn't have the information, he can't intentionally misrepresent that information to the court, and he can't be deliberately indifferent to the truth. There is no legal obligation that a police officer complete an investigation before asking for a search warrant. Once probable cause is established, a police officer is within his right to go, ask for a search warrant that will help progress the investigation. And that's exactly what was done in this case. Unless there are any other questions, I don't have anything else to add. MS. NAHID BHADELIA. No questions. Thank you very much for your argument. All right. Let's put a minute on the clock. MR. If I may, I mean, I think Judge Tsushima mentioned that you should construe the remaining facts in the same manner as a search warrant would be construed, and the court decisions in Rini and Hervey both reject that. And I'd encourage the court, I'd refer the court to those decisions. But just, I guess, the big-picture point here, this is a search warrant in a murder investigation where there is no medical evidence whatsoever of foul play, and all of the medical evidence suggests the absence of foul play. And so, once this MR. Is that necessarily undermined of finding a probable cause of issue?  Well, I'm saying now, once MR. A probable cause, finding the fact that there's no medical evidence of foul play? MR. Well, once you strip out the fact that we have no evidence of foul play, now we're talking about these various items that are listed in his complaint. I would submit none of these items are sufficient to establish probable cause. Sufficient that if the evidence wouldn't establish guilt, but it may establish probable cause, would that be sufficient? What I'm saying, if there is no evidence of foul play, the fact that Gary expressed grief in a way that some people found suspicious does not establish probable cause. That taken alone, but there were many other factors other than the way in which your client might have expressed guilt. Can I, I will very briefly, in one sentence, address each factor, right? We have Dr. Metzger's presence at the hospital, right? He's the family doctor for Gary. How is that suspicious to you? I agree with you. Each factor may, in and of itself, not be sufficient. I think in total, the question is whether it's sufficient to think that the death is suspicious for probable cause purposes. But we understand your argument. I think we have it well in hand. Thank you to both sides for your arguments. Thank you, Your Honor. The matter, I just argue, is submitted for decision by the Court, and we're adjourned for the week. Great.
judges: Tashima, Nguyen, Marbley